**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **MISSISSIPPI PHOSPHATES CORP.** | § | **PLAINTIFF** |
| | § | |
| **v.** | § | **CAUSE NO. 1:07CV1140 LG-RHW** |
| | § | |
| **FURNACE AND TUBE SERVICE, INC.** | § | **DEFENDANT/** |
| | § | **THIRD-PARTY PLAINTIFF** |
| **v.** | § | |
| | § | |
| **GRAY INSURANCE COMPANY** | § | **THIRD-PARTY DEFENDANT** |

**MEMORANDUM OPINION AND ORDER**
**DENYING MOTION FOR SUMMARY JUDGMENT**

BEFORE THE COURT is the Motion to Summary Judgment [188] with respect to

insurance coverage, filed by Third-Party Defendant Gray Insurance Company. Furnace & Tube

Service, Inc. ("F&T") has filed a response, and Gray has replied. Gray asserts that the policies it

issued to F&T provide no coverage for any of the claims made in the Third Amended Complaint

filed by Mississippi Phosphates Corporation, and Gray is therefore entitled to summary judgment

in its favor. After due consideration of the submissions, the Court finds that no exclusion to

coverage applies to the claims against F&T. Therefore, Gray's Motion will be denied.

FACTS

The Third Amended Complaint describes the facts of this case as follows. In July 2007,

F&T undertook a project to re-build the waste heat boiler in MPC's Number 2 Sulfuric Acid

Plant. Among other things, F&T was to cut out the two tube sheets (one at either end of the

shell), remove same and the tubes running between them, repair the shell as needed, and install

new tube sheets and tubes.

After welding the new tube sheets (not furnished by F&T, but already owned by MPC) to

the boiler shell and installing several hundred tubes (not furnished by F&T, but already owned by MPC), F&T brought in a subcontractor, Analytic Stress Relieving, to heat treat the welds by which the new tube sheets were joined to the boiler shell. This process is designed to relieve stress in those welds.

While ASR was heat treating the welds, both of the tube sheets unexpectedly warped. Because the warping could not be rectified, both of the tube sheets had to be cut out of the boiler (damaging the boiler in the process) and discarded, along with the tubes that were installed at the time. As a result of this accident, the project could not be completed on time, and MPC suffered the loss of use of the boiler (and its components), and of the No. 2 Sulfuric Acid Plant as a whole (and its components). Also, MPC was forced to incur additional operating expenses.

F&T admitted and accepted responsibility, obtained replacement tube sheets and tubes, and completed the project, putting the boiler back in service and representing to MPC, expressly and/or impliedly, that F&T had performed in a workmanlike manner, and that the boiler was ready to be placed back into service.

Shortly thereafter the boiler began to leak. Water from the inside of the boiler escaped, damaging, at least temporarily, refractory and related materials, such as ceramic ferrules, mortar and/or insulation connected to or on the outside of the boiler. Also, water from the inside of the boiler leaked into the stream of sulfur dioxide and sulfur trioxide that passes through the waste heat boiler (which stream is supposed to pass through the boiler without contacting the water inside the boiler). This water damaged the catalyst downstream of the waste heat boiler, reducing its effectiveness and/or shortening its useful life. Also, at least some of this water combined with sulfur trioxide to form weak sulfuric acid, which corroded some or all of the

things that it contacted, including but not limited to tubes, one or both of the tube sheets, and the portions of the Number 2 Sulfuric Acid Plant that lie downstream of the boiler. As a result of the leak, some of the sulfur dioxide or sulfur trioxide was lost, further damaging MPC.

The leaks caused other damage as well. MPC expended time and incurred expense locating and repairing them; in order to access the leaks, refractory and related materials, such as ceramic ferrules, mortar and/or insulation on or connected to the boiler had to be removed (destroying same in the process); tubes had to be removed, damaging them and/or the tube sheet; and the boiler had to be shut down, as a result of which MPC lost the use of the boiler (and its components), and of the No. 2 Sulfuric Acid Plant as a whole (and its components). Also, MPC was forced to incur additional operating expenses.

In addition, F&T has taken the position with MPC that the imperfect weld referred to was not in fact an imperfect weld, but a crack, and that same occurred when the waste heat boiler was cooled off so that leaks could be repaired, and/or when the boiler was returned to operating temperature after such repairs. MPC denies this, but, in the alternative, should this be established, the crack would constitute additional damage attributable to the leaks.

Leaks and resulting damages occurred repeatedly. On each occasion, F&T would make repairs, and would put the boiler back in service, representing to MPC, expressly and/or impliedly, that F&T had performed in a workmanlike manner, and that the boiler was ready to be placed back into service.

At one point it appeared that F&T's repairs had succeeded, but in January of 2008 the boiler began to leak again. Among other items, investigation revealed that the weld between the shell and one of the tube sheets was imperfect, and had to be ground out and re-done. Ultimately

MPC was forced to retain another contractor to dismantle the boiler (thus destroying the replacement tube sheets and tubes, and damaging the boiler) and rebuild it. Again, this shutdown caused MPC to suffer the loss of use of the boiler (and its components), and the No. 2 Sulfuric Acid Plant as a whole (and its components). Also, MPC was forced to incur additional operating expenses. MPC seeks by this lawsuit to recoup its losses, totaling in the millions of dollars, from F&T.

F&T purchased policies of insurance from The Gray Insurance Company prior to performing the work for MPC. Gray asserts in this Motion for Summary Judgment that the insurance policies provide no coverage for the claims brought against F&T by MPC, based on certain exclusions: the "Work Product" exclusion; the "Impaired Property" exclusion; and the "Care, Custody and Control" exclusion. The relevant policy provisions are as follows.

The "Work Product" exclusion (including the Care, Custody and Control" exclusion):

This insurance does not apply to:

j.    "Property Damage" to:

   (4)    Personal property in the care, custody or control of the insured;
   (5)    that particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or
   (6)    that particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
   Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard."

l.    "Property Damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard."

   This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

-4-

<u>The "Impaired Property" exclusion:</u>

This insurance does not apply to:

m.      "Property Damage" to "impaired property" or property that has not been physically injured, arising out of:

      (1)      A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

      (2)      A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

The terms in the exclusions are defined in the policy as follows:

5.      "Impaired property" means tangible property, other than "your product" or "your work," that cannot be used or is less useful because:

      a.      It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

      b.      You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

      a.      The repair, replacement, adjustment or removal of "your product" or "your work;" or

      b.      Your fulfilling the terms of the contract or agreement.

11.      a.      "Products-completed operations hazard" includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:
      (1) Products that are still in your physical possession; or
      (2) Work that has not yet been completed or abandoned.

      b.      "Your work" will be deemed completed at the earliest of the following times:
      (1) When all of the work called for in your contract has been completed.
      (2) When all of the work to be done at the site has been completed if your contract calls for work at more than one site.
      (3) When that part of the work done at a job site has been put to its

intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

12. "Property damage" means:
    a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
    b.    Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

15. "Your work" means:
    a.    Work or operations performed by you or on your behalf; and
    b.    Materials, parts or equipment furnished in connection with such work or operations.
"Your work" includes:
    a.    Warranties or representations made at any time with respect to the fitness, quality, durability, performance, or use of "your work," and
    b.    The providing of or failure to provide warnings or instructions.

Ct. R. 188-8.

## The Applicable Law

F&T is a Louisiana corporation with its principal place of business in Louisiana. Gray is a Louisiana insurance company with its principal place of business in Louisiana. The insurance policy was issued in Louisiana. The parties agree that Louisiana law governs the interpretation of this contract. Accordingly, the Court will consult Louisiana law to resolve the coverage question presented by this Motion.

The Louisiana Supreme Court has set out the standard for interpreting a liability insurance contract as follows:

An insurance policy is a conventional obligation that constitutes the law between the insured and the insurer, and the agreement governs the nature of their

relationship.  An insurance policy is a contract, which must be construed employing the general rules of interpretation of contracts.  If the insurance policy's language clearly expresses the parties' intent and does not violate a statute or public policy, the policy must be enforced as written. However, if the insurance policy is susceptible to two or more reasonable interpretations, then it is considered ambiguous and must be liberally interpreted in favor of coverage.

Liability insurance policies should be interpreted to effect, rather than to deny coverage. However, it is well-settled that unless a statute or public policy dictates otherwise, the insurers may limit liability and impose such reasonable conditions or limitations upon their insureds.  In these circumstances, unambiguous provisions limiting liability must be given effect.  With that stated, we note that the insurer bears the burden of proving that a loss falls within a policy exclusion.

*Supreme Servs. & Specialty Co., Inc. v. Sonny Greer, Inc.,* 958 So. 2d 634, 638-639 (La. 2007)

(citations omitted).  Any exclusion from coverage in an insurance policy must be clear and

unmistakable.  *Bell v. Burgueno*, 996 So. 2d 404, 409 (La. Ct. App. 2008).  Exclusionary clauses

are to be narrowly construed against the insurer and in favor of coverage.  *Capital Bank & Trust*

*Co. v. Equitable Life Assur. Soc. of the United States,* 542 So.2d 494, 495 (La. 1989).

DISCUSSION

A.  The "Work Product" Exclusion:

In *Supreme Services*, the Louisiana Supreme Court examined "Work Product" and

"Products-Completed Operations Hazard" policy exclusions in regard to a defective concrete

slab.  There was no other damage claimed to be a result of or collateral to the defective concrete

slab.  *Supreme Servs.*, 958 So. 2d at 636.  The court concluded that because there was no

evidence of any injured third person or product as a result of the damaged property, the relevant

exclusion was the "Work Product" provision, and not the "Products-Completed Operations

Hazard" provision.  *Id*. at 642.  The Work Product exclusion eliminated coverage for repair and

replacement costs of the faulty concrete slab. The court noted that Louisiana courts had "consistently held that the 'work product' exclusion eliminates coverage for the cost of repairing or replacing the insured's own work or defective product." *Id*. at 643.

In a holding more relevant to the issue in this case, the court found no conflict between the Work Product and the Products-Completed Operations Hazard provisions:

> Under the "work product" exclusion, the insured or its subcontractor becomes liable for damages to its work or its product caused by its faulty workmanship. Under the PCOH provision, damages, other than the faulty product or work itself, arising out of the faulty workmanship are covered by the policy. Stated differently, if a subcontractor's faulty electrical work caused the building to burn down before completion, the "work product" exclusion would eliminate coverage for the faulty electrical work performed by the contractor or subcontractor. However, the operations hazard coverage applies not to the faulty work, but damages arising out of the faulty work. Damage to real property arising out of the faulty work (fire damage) would not be excluded as it would be covered under the PCOH provision.

*Id*. at 645.

In this case, the work was completed, as, according to the complaint, the boiler had been placed into service when the leaks occurred. Accordingly, neither of the exceptions to the Products-Completed Operations Hazard applies to the damages arising out of F&T's work. Although the Work Product exclusion in this policy eliminates coverage for the cost of repairing or replacing F&T's defective work, the Products-Completed Operations Hazard provision specifies that damages other than the faulty work itself, arising out of the faulty workmanship, are not included in the Work Product exclusion.

B. The "Impaired Property" Exclusion:

Louisiana courts have had the opportunity to construe language identical to the Impaired Property exclusionary provision in this case in connection with similar factual circumstances.

For example, in *Grimaldi Mechanical, LLC v. The Gray Insurance Company*, 933 So. 2d 887 (La. Ct. App. 2006), the court considered whether an insurer had a duty to defend against allegations of defective or improper installation of hot water piping. There was evidence that some damage to other property might have occurred when the piping system was tested. The court found "there may have been an occurrence which may have resulted in damage to property, thereby triggering Gray's duty to defend under the policy." *Id*. at 898.

In *Stewart Interior Contractors LLC v. Metalpro Industries, LLC*, 969 So. 2d 653, 664 (La. Ct. App. 2007), the court considered the applicability of the exclusion to a subcontractor's installation of defective steel studs. The appellate court could not determine from the record whether the insured's claim for "other damages" related solely to the steel studs themselves, or consequences of having to go back and repair the steel studs. The appellate court remanded the case so that the trial court could consider if there was any evidence that the insured's alleged damages "were not attendant to or caused solely as a result of the removal and repair of [the subcontractor's] allegedly defective steel studs." If there was evidence of this other damage, including loss of use, then the insurance policy provided coverage under the PCOH provision. *Id*. at 670.

Further, in *PCS Nitrogen Fertilizer, L.P. v. U.S. Filter/Arrowhead, Inc.*, 834 So. 2d 456 (La. Ct. App. 2002), the court held that this same exclusion was unambiguous, and that "the policy unambiguously provides coverage for loss of use to other property arising out of sudden and accidental physical injury to Arrowhead's water supply after the water purification system was put to its intended use." *Id*. at 459-60.

In the Court's opinion, the circumstances of this case bring it neatly within the confines

of *Grimaldi*, *Stewart*, and *PCS Nitrogen Fertilizer*. The Plaintiff seeks damages beyond those attendant to or caused solely as a result of the allegedly defective repair work performed by F&T: loss of use of other property (the Sulfuric Acid Plant) arising out of sudden and accidental physical injury to the Plant after the water boiler was put to its intended use.[1] These damages are not excluded from coverage by the Impaired Property exclusion.

CONCLUSION

The movant, Gray Insurance Company, has failed to show that the claims made against its insured, F&T Service, Inc., are excluded from coverage under the policies of insurance. Accordingly, the Motion for Summary Judgment should be denied.

**IT IS THEREFORE ORDERED AND ADJUDGED** that the Motion to Summary Judgment [188] with respect to coverage, filed by Third-Party Defendant Gray Insurance Company is **DENIED**.

**SO ORDERED AND ADJUDGED** this the 22[th] day of May, 2009.


s/ *Louis Guirola, Jr.*
LOUIS GUIROLA, JR.
UNITED STATES DISTRICT JUDGE

---

[1] F&T asserts that the evidence of these damages is in Plaintiff's Supplemental Interrogatory Responses, in which it claims $235,822.80 for refractory and brick, $9,139.46 for insulation on the boiler, $36,781.78 for ceramic ferrules, $129,747 for catalyst downstream, $26,838.60 for an economizer downstream, $18,338.80 for a heat exchanger downstream, and $8,500 for a shell plate on bottom of sulfur furnace. The Third Amended Complaint also sets out damages to other parts of the plant resulting from the boiler leaks.